DECISION AND JOURNAL ENTRY
{¶ 1} Appellant, Mother, appeals from the decision of the Summit County Juvenile Court. This Court affirms.
 I. {¶ 2} Mother is the natural mother of J.A and K.A. On March 18, 2008, Summit County Children Services Board ("CSB") filed a complaint, alleging the children to be dependent and neglected. The complaint stemmed from an inspection of Mother's home after a fire broke out. According to the undisputed evidence, the Akron Fire Department responded to a fire at Mother's home. Upon extinguishing the fire, the Fire Department became concerned with the deplorable conditions of Mother's home and contacted CSB, the Health Department and the Akron Police Department. According to a stipulation at the adjudicatory hearing, Mother's home was filthy and presented a health hazard. Due to the conditions of the home as well as the *Page 2 
occurrence of the fire, the Akron Police Department and CSB located J.A. and K.A. and took them into custody pursuant to Juv. R. 6.
 {¶ 3} On April 25, 2008, a magistrate held an adjudicatory hearing, and on May 2, 2008, found J.A. and K.A. to be neglected and dependent. The trial court adopted this decision on the same day. On May 12, 2008, Mother filed objections to these findings. On May 15, 2008, the magistrate held a dispositional hearing. In an order dated May 21, 2008, the magistrate ordered that J.A. and K.A. be returned to Mother's legal custody subject to dispositional orders of protective supervision to CSB. Also on May 21, 2008, the trial court adopted the magistrate's decision and on May 27, 2008, Mother objected to the decision.
 {¶ 4} On July 17, 2008, the trial court overruled Mother's objections to both the adjudicatory and dispositional hearing and adopted the magistrate's decision. Mother timely appealed from this decision raising five assignments of error for our review. We have rearranged and combined some of Mother's assignments of error for ease of review.
 II. ASSIGNMENT OF ERROR II "THE JUVENILE COURT COMMITTED REVERSIBLE ERROR AND ABUSED ITS DISCRETION WHEN IT OVERRULED []MOTHER'S OBJECTIONS, AND ADOPTED THE MAGISTRATE'S DECISION, BY REFUSING TO PERMIT []MOTHER TO INTRODUCE OR CONSIDER EVIDENCE SUBSEQUENT TO THE DATE THE COMPLAINT WAS FILED, IN ORDER TO EXPLAIN, INTRODUCE, OR SHOW REMEDIAL MEASURES TAKEN BY []MOTHER TO NEGATE THE ALLEGATIONS STATED IN THE COMPLAINT."
 {¶ 5} In her second assignment of error, Mother contends that the juvenile court committed reversible error and abused its discretion when it overruled her objections and adopted the magistrate's decision by refusing to permit her to introduce or consider evidence subsequent to the date the complaint was filed, in order to explain, introduce, or show remedial *Page 3 
measures taken by Mother to negate the allegations in the complaint. This argument is without merit.
 {¶ 6} Initially, we note that in her brief, Mother states that the parties stipulated that she remedied the conditions of the home after the complaint was filed. A review of the record shows that the magistrate took testimony on this issue. Further, the juvenile court noted this fact in its decision adopting the magistrate's decision and overruling Mother's objections. Therefore, our review of the record does not support Mother's argument that the juvenile court refused to permit or to consider evidence subsequent to the date of the complaint. Accordingly, Mother's second assignment of error is overruled.
 ASSIGNMENT OF ERROR I "THE JUVENILE COURT COMMITTED REVERSIBLE ERROR AND ABUSED ITS DISCRETION WHEN IT OVERRULED []MOTHER'S OBJECTIONS, AND ADOPTED THE MAGISTRATE'S DECISION, BY FINDING THAT THE ALLEGATIONS OF NEGLECT AND DEPENDENCY DID NOT HAVE TO EXIST AS OF THE DATE OF THE ADJUDICATORY HEARING."
 {¶ 7} In her first assignment of error, Mother contends that the juvenile court committed reversible error and abused its discretion when it overruled her objections and adopted the magistrate's decision, by finding that the allegations of neglect and dependency did not have to exist as of the date of the adjudicatory hearing. We do not agree.
 {¶ 8} Specifically, Mother contends that pursuant to this Court's previous decision in In re D.B., 9th Dist. Nos. 03CA0015-M, 03CA0018-M, 2003-Ohio-4526, the juvenile court was required to "determine whether at the time of the adjudicatory hearing, there is dependency or neglect, since it is the present condition that is dispositive." Our reading ofIn re D.B. does not reveal such a mandate. *Page 4 
 {¶ 9} In the instant case, the trial court pointed to our previous finding in In re Hood (July 3, 1991), 9th Dist. No. 14957, at *2. In that case, we stated, in part, that:
 "While it may be a factor relating to disposition, it is unnecessary that the original reason for the finding of dependency exist at the time of the dispositional hearing. R.C. 2151.23(A)(1) requires the juvenile court to decide the issue of dependency as of the date or dates specified in the complaint, and not as of any other date. 2 Anderson, Ohio Family Law (2 ed. 1989) 297-298, Section 19.19; See, e.g., In re Sims (1983), 13 Ohio App.3d 37, 43." (Emphasis added.) In re Hood, supra, at *2.
 {¶ 10} The juvenile court also pointed out that In re D.B. did not presumptively overrule In re Hood, as Mother suggests. Instead, In reD.B. distinguished In re Hood by pointing out that in In re Hood, the dispositional hearing was held three years after the adjudication hearing, and that the Court determined that dependency need not be reestablished at the dispositional hearing. We then stated that "[n]othing in the In re Hood opinion even suggests that evidence of events occurring after the date or dates specified in the dependency complaint would be inadmissible at the hearing to adjudicate dependency." In re D.B., supra, at ¶ 15. In other words, In re D.B. does not overrule In re Hood and does not stand for the proposition that the juvenile court was required to, as Mother suggests, "determine whether at the time of the adjudicatory hearing, there is dependency or neglect[.]" It is worth noting that we did not specifically find that this evidence was admissible. Instead, we simply found that evidence occurring after the date in the complaint was not necessarily inadmissible.
 {¶ 11} Assuming without deciding that the evidence of Mother's actions after the date of the complaint was admissible, we note that the juvenile court considered this evidence in its entry overruling Mother's objections. As we discussed in Mother's second assignment of error, our review of the record reveals that this evidence was considered. Further, as we will more fully set forth in our discussion of Mother's third and fourth assignments of error, the trial court *Page 5 
did not abuse its discretion when it found that this evidence failed to rebut the State's presentation of evidence indicating dependency and neglect. Accordingly, the juvenile court did not abuse its discretion. Mother's first assignment of error is overruled.
 ASSIGNMENT OF ERROR III "THE JUVENILE COURT COMMITTED REVERSIBLE ERROR WHEN IT FOUND BY CLEAR AND CONVINCING EVIDENCE THAT J.A. AND K.A. WERE NEGLECTED CHILDREN UNDER ORC 2151.03(A)(2) AND (A)(3)."
 ASSIGNMENT OF ERROR IV "THE JUVENILE COURT COMMITTED REVERSIBLE ERROR WHEN IT FOUND BY CLEAR AND CONVINCING EVIDENCE THAT J.A. AND K.A. WERE DEPENDENT CHILDREN UNDER ORC 2151.04(C)."
 {¶ 12} In her third and fourth assignments of error, Mother contends that the juvenile court committed reversible error when it found by clear and convincing evidence that J.A. and K.A. were neglected and dependent children. We do not agree.
 {¶ 13} Initially we note that the adjudication proceedings were held before a magistrate. The trial court adopted the magistrate's decision and Mother filed objections to the magistrate's determination. This Court reviews a trial court's order ruling on objections to a magistrate's decision for abuse of discretion. Medina Drywall Supply,Inc. v. Procom Stucco Sys., 9th Dist. No. 06CA0014-M, 2006-Ohio-5062, at ¶ 5. Under this standard, we must determine whether the trial court's decision was arbitrary, unreasonable, or unconscionable-not merely an error of law or judgment. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219. Alleged errors must relate not to the magistrate's findings or decision, but to the action of the trial court. Berry v. Firis, 9th Dist. No. 05CA0109-M, 2006-Ohio-4924, at ¶ 7, quoting Mealey v.Mealey (May 8, 1996), 9th Dist. No. 95CA0093, at *2. *Page 6 
 {¶ 14} In order to adopt the magistrate's decision to adjudicate a child dependent pursuant to R.C. 2151.04(C), the trial court must find that the magistrate determined by clear and convincing evidence that the child's "condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship[.]" See, generally, Juv. R. 29(E)(4). Clear and convincing evidence is that which will produce in the trier of fact "`a firm belief or conviction as to the facts sought to be established.'" In re Adoption of Holcomb
(1985), 18 Ohio St.3d 361, 368, quoting Cross v. Ledford (1954),161 Ohio St. 469, paragraph three of the syllabus. While requiring a greater standard of proof than a preponderance of the evidence, clear and convincing evidence requires less than proof beyond a reasonable doubt.In re Parsons (Nov. 12, 1997), 9th Dist. Nos. 97CA006662 and 97CA006663, at *3.
 {¶ 15} A finding of neglect must also be supported by clear and convincing evidence. R.C. 2151.35(A); Juv. R. 29(E)(4). In reviewing a juvenile court's adjudication of neglect, this Court must determine whether the juvenile court had before it clear and convincing evidence that the child was neglected. See In re Jones (May 2, 2001), 9th Dist. No. 20306, at *4. R.C. 2151.03(A)(2) defines a neglected child as "any child *** who lacks adequate parental care because of the faults or habits of the child's parents, guardian, or custodian[.]"
 {¶ 16} Clear and convincing evidence is not unequivocal. State v.Eppinger (2001), 91 Ohio St.3d 158, 164, quoting Cross,161 Ohio St. at 477. To the contrary, evidence may be clear and convincing and yet admit a degree of conflict and uncertainty that is properly resolved by the trier of fact:
 "The mere number of witnesses, who may support a claim of one or the other of the parties to an action, is not to be taken as a basis for resolving disputed facts. * * * Credibility, intelligence, freedom from bias or prejudice, opportunity to be informed, the disposition to tell the truth or otherwise, and the probability or improbability of the statements made, are all tests of testimonial value. Where the *Page 7 
evidence is in conflict, the trier of facts may determine what should be accepted as the truth and what should be rejected as false." Cross, 161 Ohio St. at 477-78.
 {¶ 17} The focus of a dependency adjudication is not on the fault of the parents, but on the child's environment, including the condition of the home itself and the availability of medical care and other necessities. See In re Bibb (1980), 70 Ohio App.2d 117, 120. In order to establish dependency, therefore, CSB "was required to present evidence of conditions or environmental elements that were adverse to the normal development of the children." In re A.C., 9th Dist. Nos. 03CA0053, 03CA0054, and 03CA0055, 2004-Ohio-3248, at ¶ 14, citing In reBurrell (1979), 58 Ohio St.2d 37, 39.
 {¶ 18} At the adjudication hearing, Officer Ken Shively of the Akron Police Department testified that the Akron Fire Department called him to Mother's home due to the deplorable conditions. He stated that the Akron Fire Department also contacted the health department. Shively testified that "there was just clothes everywhere just piled up, wasn't bedding, no fresh food. The one wall was burnt from whatever was cooking." Shively testified that based on the conditions of the home, he located the children, who were not at the home at the time, and the health department changed the locks on the doors.
 {¶ 19} Melvin Mosley testified that he was a property manager with the Akron Metropolitan Housing Authority ("AMHA"). He stated that in October of 2007, several months prior to the March 17th fire, he visited with Mother as a follow-up to a failed housekeeping inspection. He testified that at that time, the housekeeping of Mother's home was not up to the AMHA standards. Due to this, Mother was required to rectify the situation, which she eventually did. Mosley further testified that on March 17, 2008, he was called back to Mother's home at the request of the Akron Fire Department. He stated that the "apartment was in complete disarray, clothes on the floor, just everything on the floor, in every room, bathroom; *Page 8 
bedrooms, living room, kitchen." He then stated that the conditions were so bad that he and his boss decided to go forward with a lease cancellation. He took photographs of the home, which were presented at the hearing. He stated that he informed Mother of her rights and received a call the next day informing him that the conditions had been corrected. Mosley testified that he held a hearing with Mother on this issue.
 {¶ 20} On cross-examination, Mosley testified that after he initially visited Mother's home in October of 2007, it took her a few weeks to cure the housekeeping issue. Mosley stated that a housekeeping issue was a "curable violation." On the day of his hearing with regard to the March 17, 2008 violation, he visited the home again and testified that Mother "accept[ed] responsibility for the condition of the home[.]" He testified that upon inspection, the conditions from March 17, 2008 had been cured.
 {¶ 21} On redirect examination, Mosley testified that when he visited the home on March 17, 2008, the home was not a safe place for adults and children to live.
 {¶ 22} Ed Dieringer testified that he was a housing inspector with the Akron Health Department. He testified that he conducted the March 17, 2008 investigation of Mother's home. He stated that the home was in "extreme clutter, general disarray of, you know, items in the house." He testified that upon his investigation he believed the conditions of the home to be "hazardous." He then issued orders to the AMHA to fix the door and to Mother to clean the property. Dieringer testified that he went back to the home on March 31, 2008 and Mother had cleaned the home. He testified that she was staining the hardwood floors at the time. "I felt that she had done what she needed to to bring the house into compliance with my orders, so therefore, I closed the file." As of March 31, 2008, Dieringer believed that the home was safe and secure for children and adults. *Page 9 
 {¶ 23} Amy Schuster, an intake caseworker for CSB, testified that, at the time of intake, K.A. was four months old and J. A. was four years old. Schuster testified that her concerns were that there had been a fire in the home and that the "conditions of the home were deplorable." She stated that upon her review of the home she
 "observed clothing, food, just trash in general all over the floors. There was very little clear space on the floors. The home smelled of a grease fire, or it smelled strongly of fire, I should say. There was toilet paper on the floors, the toilet was full of human feces, there was a litter box full of feces, the furniture was dirty and unkempt."
 {¶ 24} She further testified that part of the referral stated that there was cat feces and vomit in the crib. She stated that clothing, trash, and old food were lying on the floor. Upon seeing the conditions of the home, Schuster testified that police invoked Juv. R. 6, which allowed them to take the children from daycare into custody. Schuster testified that upon arriving at the daycare, J.A.'s clothing was very dirty and he had on a lot of clothing, which was inappropriate for the weather. She further testified that J. A. was dirty and that he smelled. Schuster stated that K.A.'s clothing was dirty as well and she also had on more clothing than was appropriate for the weather. According to Schuster, K.A. was dirty and needed to be bathed.
 {¶ 25} Schuster testified that Mother came to the agency the following day. According to Schuster, "Mother reported that she was lazy and that [J.A.] was responsible for making a lot of the mess." Schuster stated that Mother expected J.A. to clean the mess. The State rested its case.
 {¶ 26} Mother testified that she moved into the home in April of 2006. When asked if it was "fair to say that [her] home was extremely dirty[,]" Mother answered, "Yes." When asked if the home was "extremely filthy" and a "health hazard[,]" Mother responded, "Yes." Mother testified that the family had not been staying in the home for over a month and that she was not *Page 10 
sure how the fire started. She explained that it must have been a "coincidence." Mother testified that immediately after she was notified of the fire, she went to the home and began to clean it up. She stated that she had spoken with a nutritionist at the WIC office and fed J.A. peanut butter and jelly and eggs because he did not like meat. She stated that she fed K.A. formula. When asked how the home came to be in such horrible condition, Mother stated that she did it when she was "look[ing] for stuff." She denied telling Schuster that she was lazy and testified that she did not expect J.A. to clean up the mess. She testified that she took her children to the doctor when they needed medical treatment and that she fed them when they were hungry. She explained that she did not use corporal punishment.
 {¶ 27} On cross-examination, Mother confirmed that in October of 2007 the condition of the home was very bad. Mother again explained that the home got in bad condition while she and her children were staying with her mother. When asked about the specifics of the condition of the home, including an extremely dirty bathroom sink, Mother stated that she was not sure how it got in that condition. She explained that it was from "[m]e like coming in there, I don't know, to do something real fast and then leaving, and I kept doing it." She further explained that when she left the home, the knobs to the oven were on the counter and that she assumed the fire department replaced them to turn the stove off after the fire. She explained that if bumped, the knobs "might have turned on easily." She further stated that she remembered hitting the stove when she left, but that there were no knobs.
 {¶ 28} We conclude that the trial court did not abuse its discretion when it determined that the magistrate had before him clear and convincing evidence that J.A. and K.A. were neglected children. Again, R.C. 2151.03(A)(2) defines a neglected child as "any child *** who lacks adequate parental care because of the faults or habits of the child's parents, guardian, or *Page 11 
custodian[.]" The evidence showed that due to Mother's own admissions, her home was unsanitary and a health hazard. Further, Schuster testified that when she picked up the children they were dirty, smelled, and were inappropriately dressed for the weather. Therefore, the juvenile court did not abuse its discretion when it found that J.A. and K.A.'s "mother allowed them to live in a home that was filthy, unsanitary, and hazardous to their health and well being, and pursuant to [R.C.] 2151.03(A)(3) as their mother neglected the children or refused to provide them with a clean and safe home which is necessary for their health and well being."
 {¶ 29} We further conclude that the trial court did not abuse its discretion when it found that the magistrate had before it clear and convincing evidence that J.A. and K.A. were dependent children. To find the children dependent, the juvenile court was required to find that CSB presented evidence that the conditions or environmental elements were adverse to J.A. and K.A's development. CSB presented evidence from several witnesses that Mother's home was a health hazard and that it was unsafe for the children to live there.
 {¶ 30} Accordingly, Mother's third and fourth assignments of error are overruled.
 ASSIGNMENT OF ERROR V "THE JUVENILE COURT COMMITTED REVERSIBLE ERROR WHEN IT PROCEEDED TO DISPOSITION ON THE GROUNDS THAT THERE WAS AN AUTOMATIC STAY WHEN []MOTHER FILED OBJECTIONS TO THE MAGISTRATE'S DECISION MADE AT THE ADJUDICATORY HEARING. THE JUVENILE COURT LACKED JURISDICTION TO PROCEED TO DISPOSITION UNDER JUV.R. 40(D)(3)(E) AND SUMMIT COUNTY JUV.R. 3.03(H)."
 {¶ 31} In her fifth assignment of error, Mother contends that the juvenile court committed reversible error when it proceeded to disposition. Mother claims that there was an automatic stay in effect when she filed objections to the magistrate's decision made at the *Page 12 
adjudicatory hearing and the juvenile court lacked jurisdiction to proceed to disposition under Juv. R. 40(D)(3)(e) and Summit County Juv. R. 3.03(H). We do not agree.
 {¶ 32} On May 12, 2008, Mother objected to the magistrate's May 2, 2008 adjudication determinations. The trial court adopted the magistrate's decision on May 2, 2008. The magistrate then proceeded to disposition on May 15, 2008 and on May 21, 2008, issued a determination. The trial court adopted these findings and on May 27, 2008, Mother objected to the findings.
 {¶ 33} Mother argues that pursuant to Juv. R. 40(D)(3)(e) her timely objections acted to automatically stay the proceedings and that "the Juvenile Court lacked jurisdiction to proceed to the dispositional hearing when []Mother filed objections to the findings made at the adjudicatory hearing; and therefore its decision made at the dispositional hearing is null and void ab initio" These arguments are without merit.
 {¶ 34} Juv. R. 40(D)(3)(e)(i) states, in relevant part:
 "The court may enter a judgment either during the fourteen days permitted by Juv. R. 40(D)(3)(b)(i) for the filing of objections to a magistrate's decision or after the fourteen days have expired. If the court enters a judgment during the fourteen days permitted by Juv. R. 40(D)(3)(b)(i) for the filing of objections, the timely filing of objections to the magistrate's decision shall operate as an automatic stay of execution of the judgment until the court disposes of those objections and vacates, modifies, or adheres to the judgment previously entered." (Emphasis added.)
 {¶ 35} We have previously stated that
 "the automatic stay triggered by Juv. R. 40(D)(3)(e) did not divest the trial court of subject matter jurisdiction over this case. The subject matter jurisdiction of a court refers to the type of case that the court is authorized to hear. A court does not exceed its subject matter jurisdiction as long as the case before it involves any cause of action cognizable by the forum." (Internal citations and quotations omitted.) In re P.T., 9th Dist. No. 24207, 2008-Ohio-4690, at ¶ 8. *Page 13 
This case clearly falls within the juvenile court's subject matter jurisdiction pursuant to R.C. 2151.23(A)(1), which explicitly gives the juvenile court original jurisdiction over child abuse, neglect, and dependency cases. Id., at ¶ 9. Instead, "Mother's real argument is that the trial court improperly exercised its jurisdiction by proceeding with disposition[.]" Id., at ¶ 10.
 {¶ 36} "Mother's claim that the trial court exceeded its authority under Juv. R. 40 merely challenges the trial court's authority to exercise its jurisdiction in this case. Even if her challenge had merit, it would have rendered the judgment voidable, not void[.]" Id., at ¶ 11, citing State v. Parker, 95 Ohio St.3d 524, 2002-Ohio-2833, at ¶ 20 (Cook, J., dissenting). Therefore, Mother's argument that the decision made at the dispositional hearing is void is without merit.
 {¶ 37} Further, despite Mother's argument, Juv. R. 40 does not provide that timely objections to the magistrate's decisions act to automatically stay the proceedings, but rather, the objections act to automatically stay the execution of the judgment. The term "execution" is defined as "the act of carrying out or putting into effect (as a court order)[.]" Black's Law Dictionary (8th Ed., 2004). Therefore, the juvenile court could not carry out or put into effect the adjudication order until it ruled on her objections. Under Mother's view of this section, the juvenile court could not proceed until it first disposed of her objections. We do not agree with this interpretation and we find no support for it in the law. By proceeding to disposition, the juvenile court was not carrying out or putting the adjudication order into effect.
 {¶ 38} Accordingly, we overrule Mother's fifth assignment of error.
 III. {¶ 39} Mother's assignments of error are overruled. The judgment of the Summit County Juvenile Court is affirmed.
 Judgment affirmed. *Page 14 
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App. R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App. R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App. R. 30.
Costs taxed to Appellant.
DICKINSON, J. CONCURS